UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 07-22120-CIV

CIV - SEITZ

FILED by SK D.C.
DKTG
AUG 16 2007
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

MCALILEY

FISK ELECTRIC COMPANY,

Plaintiff,

v.

SOLO CONSTRUCTION CORPORATION

and

LIBERTY MUTUAL INSURANCE COMPANY,

Defendants.

## COMPLAINT

Plaintiff FISK ELECTRIC COMPANY sues Defendants SOLO CONSTRUCTION CORPORATION and LIBERTY MUTUAL INSURANCE COMPANY and alleges that it is entitled to relief upon the following facts:

### The Parties

1. Plaintiff FISK ELECTRIC COMPANY ("Fisk") is a corporation incorporated under the laws of the State of Texas having its principal place of business in the State of Texas.

2. Defendant SOLO CONSTRUCTION CORPORATION (hereinafter "Solo") is a corporation incorporated under the laws of the State of Florida having its principal place of business in the State of Florida.

3. Defendant LIBERTY MUTUAL INSURANCE COMPANY ("Liberty") is a corporation incorporated under the laws of the State of Massachusetts having its principal place of business in the State of Massachusetts.

**Jurisdiction and Venue**

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states and the amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

5. Pursuant to 28 U.S.C. § 1391(a)(2), venue lies in the Southern District of Florida because a substantial part of the events and omissions giving rise to the claims occurred in this District and because a substantial part of property that is the subject of the action is situated in this District.

**Count I – Claim Against the Payment Bond**
**(Against Solo and Liberty)**

6. Paragraphs 1 through 5 above are incorporated by reference as if fully set forth herein and Fisk further alleges:

7. Miami-Dade County (the "County") owns Miami International Airport.

8. On or around May 16, 2001, Solo entered into the Prime Contract with the County for the construction of the Midfield Expansion Phase IIIC Project (the "Midfield Expansion Project") on the airside part of the Miami International Airport.

9. The construction project was divided into fifteen separate Maintenance of Airside Traffic ("MOT") stages for both daytime and nighttime work in order to accommodate and minimize the impact on airside operations.

10. In connection therewith and pursuant to Florida Statute 255.05, Solo, as principal, and Liberty, as surety, executed and delivered their payment bond (the "Payment Bond") to the County for said improvements, copy attached hereto as **Exhibit 1.**

11. On or around July 1, 2002, Solo entered into a subcontract with Fisk to provide the temporary lighting for daytime and nighttime operations for the Midfield Expansion Project (the "Subcontract"), copy attached hereto as **Exhibit 2.**

12. Fisk was responsible for maintaining temporary electrical services throughout the duration of the various phases in order to maintain air traffic and pedestrian traffic safely during the overall Midfield Expansion Project.

13. During Fisk's performance of its subcontract work, the MOT Phasing was radically changed, which severely impacted airfield operations. As a result, Fisk was required to provide additional temporary lighting in order to accommodate this radical change from the originally agreed upon phasing contained in the contract documents.

14. Fisk also encountered differing site conditions, such as existing underground utilities, during the performance of its subcontract work that were not disclosed, not shown in the contract documents, and not ascertainable by a reasonable site inspection.

15. On April 18, 2006, Fisk submitted to Solo a Change Order Request in the amount of $551,238 for providing and maintaining the additional temporary airfield lighting on the active sections of the taxiway due to the radical change in the MOT Phasing Plan set forth in the original contract documents as a result of the changes in the airside operations plans, including the additional replacement of lamps, globes, connectors, cables, etc. Solo breached the Subcontract by failing to issue a change order and by failing to pay Fisk the amounts due. Such nonpayment is also a breach by Solo and Liberty under the Payment Bond.

16. On April 19, 2006, Fisk submitted to Solo a Change Order Request in the amount of $360,552 for its increased out-of-pocket, general conditions costs for onsite

supervision, project management, general foreman, administrative personnel, engineering, and other onsite general conditions, including onsite offices, construction equipment, etc. (which items were included as "Liquidated Indirect Costs" as referred to in the Prime Contract Specifications) caused by the radical change in MOT Phasing and the differing site conditions encountered by Fisk, which extended the original mandated duration times. Solo materially breached the Subcontract by failing to issue a change order increasing the contract amount and the contract time, and by failing to pay Fisk for its portion of the indirect job field expense. Such nonpayment is also a breach by Solo and Liberty under the Payment Bond.

17. In addition, Solo breached the Subcontract and violated Florida Statutes 218.72 through 218.76 (Prompt Payment Act) by failing to pay $210,989 for approved contract billings and retention, despite having received such funds from the County. Solo never provided Fisk with written notice of any disputes relating to the amounts due. The nonpayment of said $210,989 is also a breach by Solo and Liberty under the Payment Bond.

18. Solo also breached the Subcontract by failing to pay $53,184 for work performed pursuant to change order directives issued by the County. The nonpayment of said $53,185 is also a breach by Solo and Liberty under the Payment Bond.

19. In addition, Solo breached the Subcontract by failing to pay $141,512 for Time & Material work performed by Fisk at the direction of Solo. The nonpayment of said $141,512 is also a breach by Solo and Liberty under the Payment Bond.

20. As a result of Solo's breaches of its expressed and implied duties, Fisk has been damaged by nonpayment in the total amount of $1,317,475 for said labor, services, and materials provided.

21. Fisk has performed all duties entitling it to payment.

22. The last date that Fisk furnished labor under the Subcontract was October 2, 2006, which was within one year of the filing of this Complaint.

23. Fisk served Solo and Liberty with notices of nonpayment on June 7, 2006, and again on August 2, 2006, copy attached hereto as composite **Exhibit 3.**

24. All conditions precedent to the bringing of this action have been performed, have been satisfied, or have been waived.

**WHEREFORE,** Fisk prays that this Court will:

a. Enter judgment for damages jointly and severally against Solo and Liberty, plus attorney fees, interest, and costs.

b. Grant such other equitable relief deemed appropriate.

**Count II – Breach of the Subcontract**
**(Against Solo)**

Paragraphs 1 through 5 and Paragraphs 7 through 22 above are incorporated by reference as if fully set forth herein and Fisk further alleges:

25. As a result of Solo's breaches of its expressed and implied duties, Fisk has been damaged by nonpayment in the total amount of $1,317,475 for said labor, services, and materials provided.

26. All conditions precedent to the bringing of this action have been performed, have been satisfied, or have been waived.

**WHEREFORE,** Fisk prays that this Court will:

a. Enter judgment for damages against Solo, plus attorney fees, interest and costs.

b. Grant such other equitable relief deemed appropriate.

**JURY DEMAND**

27. Plaintiff hereby requests a trial by jury on all issues so triable.

Dated: August 14, 2007

Respectfully submitted,

Herman M. Braude, Esq. (FBN 148644)
Richard Y. Rho, Esq. (FBN 660191)
Michelle R. Daley, Esq. (FBN 831891)
BRAUDE & MARGULIES, P.C.
1200 Potomac St., N.W.
Washington, DC 20007
Tel: (202) 471-5400
Fax: (202) 471-5404
hbraude@braudemargulies.com
rrho@braudemargulies.com
mdaley@braudemargulies.com

# Exhibit 1

THIS POWER OF ATTORNEY IS NOT VALID UNLESS IT IS PRINTED ON RED BACKGROUND.

130565

This Power of Attorney limits the act of those named herein, and they have no authority to bind the Company except in the manner and to the extent herein stated.

LIBERTY MUTUAL INSURANCE COMPANY
BOSTON, MASSACHUSETTS

# POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS: That Liberty Mutual Insurance Company (the "Company"), a Massachusetts mutual insurance company, pursuant to and by authority of the By-law and Authorization hereinafter set forth, does hereby name, constitute and appoint, DAVID R. HOOVER, JOHN L. VALOZE, CATARINA A. BRENNAN, ALL OF THE CITY OF MAITLAND, STATE OF FLORIDA ..............................

each individually if there be more than one named, its true and lawful attorney-in-fact to make, execute, seal, acknowledge and deliver, for and on its behalf as surety and as its act and deed, any and all undertakings, bonds, recognizances and other surety obligations. The execution of such bonds or undertakings, in pursuance of these presents, shall be as binding upon the Company as if they had been duly signed by the president and attested by the secretary of the Company in their own proper persons.

That this power is made and executed pursuant to and by authority of the following By-law and Authorization:

ARTICLE XVI - Execution of Contracts: Section 5. Surety Bonds and Undertakings.

Any officer or other official of the company authorized for that purpose in writing by the chairman or the president, and subject to such limitations as the chairman or the president may prescribe, shall appoint such attorneys-in-fact, as may be necessary to act in behalf of the company to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations. Such attorneys-in-fact, subject to the limitations set forth in their respective powers of attorney, shall have full power to bind the company by their signature and execution of any such instruments and to attach thereto the seal of the company. When so executed such instruments shall be as binding as if signed by the president and attested by the secretary.

By the following instrument the chairman or the president has authorized the officer or other official named therein to appoint attorneys-in-fact:

Pursuant to Article XVI, Section 5 of the By-laws, Assistant Secretary Garnet W. Elliott is hereby authorized to appoint such attorneys-in-fact as may be necessary to act in behalf of the company to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations.

That the By-law and the Authorization above set forth are true copies thereof and are now in full force and effect.

IN WITNESS WHEREOF, this instrument has been subscribed by its authorized officer and the corporate seal of the said Liberty Mutual Insurance Company has been affixed thereto in Plymouth Meeting, Pennsylvania this 14th day of August, 2000.

LIBERTY MUTUAL INSURANCE COMPANY

By Garnet W. Elliott
Garnet W. Elliott, Assistant Secretary

COMMONWEALTH OF PENNSYLVANIA ss
COUNTY OF MONTGOMERY

On this 14th day of August, A.D. 2000, before me, a Notary Public, personally came the individual, known to me to be the therein described individual and officer of Liberty Mutual Insurance Company who executed the preceding instrument, and he acknowledged that he executed the same and that the seal affixed to the said preceding instrument is the corporate seal of said company; and that said corporate seal and his signature subscribed thereto was duly affixed and subscribed to the said instrument by authority and direction of the said company.

IN TESTIMONY WHEREOF, I hereunto set my hand and affix my official seal at Plymouth Meeting, PA, the day and year first above written.

NOTARIAL SEAL
DONNA E. SHIELDS, Notary Public
Plymouth Twp., Montgomery County
My Commission Expires Feb. 2, 2003

Donna E. Shields
Notary Public

COMMONWEALTH OF PENNSYLVANIA NOTARY PUBLIC

## CERTIFICATE

I, the undersigned, Assistant Secretary of Liberty Mutual Insurance Company, do hereby certify that the original power of attorney of which the foregoing is a full, true and correct copy, is in full force and effect on the date of this certificate; and I do further certify that the officer who executed the said power of attorney was one of the officers specially authorized by the chairman or the president to appoint any attorney-in-fact as provided in Article XVI, Section 5 of the By-laws of Liberty Mutual Insurance Company.

This certificate may be signed by facsimile under and by authority of the following vote of the board of directors of Liberty Mutual Insurance Company at a meeting duly called and held on the 12th day of March, 1980.

VOTED: That the facsimile or mechanically reproduced signature of any assistant secretary of the company wherever appearing upon a certified copy of any power of attorney issued by the company, shall be valid and binding upon the company with the same force and effect as though manually affixed.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed the corporate seal of the said company, this 17th day of April, 2002.

Assistant Secretary

THIS POWER OF ATTORNEY MAY NOT BE USED TO EXECUTE ANY BOND WITH AN INCEPTION DATE AFTER August 14, 20 02

Not valid for mortgage, note, loan, letter of credit, bank deposit, currency rate, interest rate or residual value guarantees.

To confirm the validity of this Power of Attorney call 1-610-832-8240 between 9:00 am and 4:30 pm EST on any business day

BOND NO. 964-000-731(B)

SURETY PAYMENT BOND

By this Bond, We SOLO CONSTRUCTION CORPORATION, as Principal, whose principal business address is 3855 COMMERCE PARKWAY, MIRAMAR, FL 33025, as Contractor under the contract dated ______, 20____, between Principal and Miami-Dade County for the construction of Midfield Expansion Phase IIIC, Project No. 95-087M-11, (hereinafter referred to as "Contract") the terms of which Contract are incorporated by reference in its entirety into this Bond and LIBERTY MUTUAL INSURANCE COMPANY, a corporation, whose principal business address is 175 BERKLEY ST., BOSTON, MA 02117, as Surety, are bound to Miami-Dade County (hereinafter referred to as "County") in the sum of ** (U.S. Dollars) $ 26,937,247.64, for payment of which we bind ourselves, our heirs, personal representatives, successors, and assigns, jointly and severally.

** TWENTY-SIX MILLION, NINE HUNDRED THIRTY-SEVEN THOUSAND, TWO HUNDRED FORTY-SEVEN DOLLARS AND 64/100

THE CONDITION OF THIS BOND is that if Principal:

1. Promptly makes payments to all claimants, as defined in Section 255.05(1), Florida Statutes, supplying Principal with labor, materials, or supplies, used directly or indirectly by Principal in the prosecution of the work provided for in the Contract, which is made a part of this bond by reference, and in the times and in the manner prescribed in the Contract; and

2. Pays County all losses, damages, expenses, costs and attorney's fees, including appellate proceedings, that County sustains because of a failure by Principal to make any such payments;

then this bond is void; otherwise it remains in full force.

A claimant shall have a right of action against the Principal and the Surety for the amount due it. Such action shall not involve the County in any expense.

A claimant, except a laborer, who is not in privity with the Principal and who has not received payment for its labor, materials, or supplies shall, within 45 days after beginning to furnish labor, materials, or supplies for the prosecution of the work, furnish the Principal with a notice that it intends to look to the bond for protection. A claimant who is not in privity with the Principal and who has not received payment for its labor, materials, or supplies shall, within 90 days after performance of the labor or after complete delivery of the materials or supplies, deliver to the Principal and to the Surety written notice of the performance of the labor or delivery of the materials or supplies and of the nonpayment.

No action for labor, materials or supplies may be instituted against the Principal or the Surety unless both notices have been given. No action shall be instituted against the Principal or the Surety on the bond after one (1) year from the performance of the labor or completion of delivery of the materials or supplies. A claimant may not waive in advance its right to bring an action under the bond against the surety.

Any changes in or under the Contract Documents and compliance or non-compliance with any formalities connected with the Contract or the changes does not affect Surety's obligation under this Bond.

BOND NO. 964-000-731

SURETY PAYMENT BOND

By this Bond, We SOLO CONSTRUCTION CORPORATION, as Principal, whose principal business address is 3855 COMMERCE PARKWAY, MIRAMAR, FL 33025, as Contractor under the contract dated ______, 20____, between Principal and Miami-Dade County for the construction of Midfield Expansion Phase IIIC, Project No. 95-087M-11, (hereinafter referred to as "Contract") the terms of which Contract are incorporated by reference in its entirety into this Bond and LIBERTY MUTUAL INSURANCE COMPANY, a corporation, whose principal business address is 175 BERKLEY ST., BOSTON, MA 02117 as Surety, are bound to Miami-Dade County (hereinafter referred to as "County") in the sum of ** (U.S. Dollars) $ 26,937,247.64, for payment of which we bind ourselves, our heirs, personal representatives, successors, and assigns, jointly and severally.

** TWENTY-SIX MILLION, NINE HUNDRED THIRTY-SEVEN THOUSAND, TWO HUNDRED FORTY-SEVEN DOLLARS AND 64/100

THE CONDITION OF THIS BOND is that if Principal:

1. Promptly makes payments to all claimants, as defined in Section 255.05(1), Florida Statutes, supplying Principal with labor, materials, or supplies, used directly or indirectly by Principal in the prosecution of the work provided for in the Contract, which is made a part of this bond by reference, and in the times and in the manner prescribed in the Contract; and

2. Pays County all losses, damages, expenses, costs and attorney's fees, including appellate proceedings, that County sustains because of a failure by Principal to make any such payments;

then this bond is void; otherwise it remains in full force.

A claimant shall have a right of action against the Principal and the Surety for the amount due it. Such action shall not involve the County in any expense.

A claimant, except a laborer, who is not in privity with the Principal and who has not received payment for its labor, materials, or supplies shall, within 45 days after beginning to furnish labor, materials, or supplies for the prosecution of the work, furnish the Principal with a notice that it intends to look to the bond for protection. A claimant who is not in privity with the Principal and who has not received payment for its labor, materials, or supplies shall, within 90 days after performance of the labor or after complete delivery of the materials or supplies, deliver to the Principal and to the Surety written notice of the performance of the labor or delivery of the materials or supplies and of the nonpayment.

No action for labor, materials or supplies may be instituted against the Principal or the Surety unless both notices have been given. No action shall be instituted against the Principal or the Surety on the bond after one (1) year from the performance of the labor or completion of delivery of the materials or supplies. A claimant may not waive in advance its right to bring an action under the bond against the surety.

Any changes in or under the Contract Documents and compliance or non-compliance with any formalities connected with the Contract or the changes does not affect Surety's obligation under this Bond.

SURETY PAYMENT BOND (Cont'd)

IN WITNESS WHEREOF, the above bounden parties have caused this Bond to be executed by their appropriate officials as of the 17TH day of APRIL, 20 03.

(CONTRACTOR)

SOLO CONSTRUCTION CORPORATION
(Contractor Name)

BY:
(President) (Managing Partner or Joint Venturer)

COUNTERSIGNED BY RESIDENT FLORIDA AGENT OF SURETY

(Copy of Agent's current D. W. MATSON III Identification Card as issued by State of Florida Insurance Commissioner must be attached)

SURETY: LIBERTY MUTUAL INSURANCE COMPANY

By: Attorney-in-Fact

(CORPORATE SEAL)

(Power of Attorney must be attached)



: DUFFIELD WALKER WATSON III

A168300

Life & Health
Gen. Lines (Prop. & Cas. Ins.)

ISSUED: 01/07/92
733526

# Exhibit 2

SOLO CONSTRUCTION CORPORATION
3855 COMMERCE PARWAY
MIRAMAR FL 33025
Tel. (954) 447-2800
Fax (954) 447-6768

## SUBCONTRACT AGREEMENT

This SUBCONTRACT AGREEMENT is made this 1st day of July , 2002, by and between SOLO CONSTRUCTION CORPORATION, a Florida Corporation with its principal place of business located at 3855 COMMERCE PARKWAY, MIRAMAR, FLORIA 33025, (954) 447-2800, facsimile number (954) 447-6768 hereinafter referred to as CONTRACTOR, and Fisk Electric, with its principal place of business located at: 10125 NW 116th Way, Suite 14, Miami Fl 33178, hereinafter referred to as SUBCONTRACTOR.

The CONTRACTOR has entered into a contract for construction dated May 16 , 2001 with Miami-Dade County, Florida, by its Board of County Commissioners whose address is 111 NW First Street, Suite 17-202 Miami, Florida 33128 , hereinafter referred to as the OWNER, for construction of the project commonly known as Midfield Expansion Phase 3-C. The contract between CONTRACTOR and OWNER hereinafter referred to as the PRIME CONTRACT provides for the furnishing of labor, materials, equipment and services in connection with construction of the project.

The Architect/Engineer, hereinafter referred to as A/E, for the project is PAWA Complex Int'l Inc. whose address is 12938 SW 133rd Court Miami Florida 33186.

NOW, THEREFORE, in exchange for the mutual conditions and covenants set forth herein, the CONTRACTOR and SUBCONTRACTOR mutually agree as set forth below.

## ARTICLE I
## SCOPE OF THE WORK

**1.1** SUBCONTRACTOR shall provide all supervision, labor, materials, equipment, tools, services, scaffolding and any and all incidental and related equipment necessary to fully and satisfactorily perform the work as described on ATTACHMENT "A", in complete and strict accordance with the contract documents.

**1.2** The work covered by this SUBCONTRACT AGREEMENT is defined below. This description is intended to be general in nature and is more specifically set forth in the plans and specifications. In the event of any conflict between the description set forth below and the plans and specifications, the plans and specifications shall govern.

**1.3** The work covered by this SUBCONTRACT AGREEMENT is defined to include, but is not necessarily limited to that described on ATTACHMENT "A".

**1.4** SUBCONTRACTOR shall perform any related work, not specifically identified or listed above, necessary to completing the work set forth above.

**1.5** In addition, SUBCONTRACTOR shall be required to perform extra or additional work, as may be required by the CONTRACTOR, OWNER, or ARCHITECT, in accordance with the provisions of Article V of this SUBCONTRACT AGREEMENT governing change orders and extra work.

## ARTICLE II

## THE CONTRACT DOCUMENTS

2.1 The CONTRACT DOCUMENTS shall consist of the following:

a. This SUBCONTRACT AGREEMENT and any modifications, changes, change orders, or extras to this agreement,

b. The PRIME CONTRACT between the CONTRACTOR and the OWNER, any other contract documents enumerated therein, and any modifications, changes, change orders, or extras to that agreement,

c. All conditions of the PRIME CONTRACT, including but limited to general, supplementary, special, and any other conditions,

d. All bonds posted by either CONTRACTOR or SUBCONTRACTOR for this project, and

e. All drawings, as listed on ATTACHMENT "B", plans and specifications issued for this project, as well as any changes, modifications, addenda, or alterations of the plans, drawings or specification, issued prior to and after execution of this SUBCONTRACT AGREEMENT.

All of these documents make up, constitute and form this SUBCONTRACT AGREEMENT and are as fully a part of this agreement as if set forth herein in full.

2.2 SUBCONTRACTOR herein acknowledges one full set of the contract documents.

2.3 SUBCONTRACTOR shall assume and be bound to CONTRACTOR for all obligations and responsibilities, which the CONTRACTOR, under the PRIME CONTRACT, has assumed and is bound to the OWNER. The CONTRACTOR shall have the benefits of all rights, remedies and redress against the SUBCONTRACTOR, which the OWNER, under the PRIME CONTRACT, has against the CONTRACTOR. Where any provision of the PRIME CONTRACT is inconsistent with this SUBCONTRACT AGREEMENT, this SUBCONTRACT AGREEMENT shall govern.

## ARTICLE III
## SUBCONTRACT SUM

3.1 CONTRACTOR shall pay to the SUBCONTRACTOR in current funds for performance of this SUBCONTRACT AGREEMENT, subject to all conditions, obligations and responsibilities set forth in the CONTRACT DOCUMENTS, and subject to any additions and deductions as provided for in the CONTRACT DOCUMENTS, the total sum of ________ Two million, seven-hundred & ninety-eight thousand, eight hundred & three dollars & seventy-six cents ________. ($2,798,803.76)

## ARTICLE IV
## TIME OF COMMENCEMENT, PERFORMANCE AND SUBSTANTIAL COMPLETION

4.1 Time is of the essence to this SUBCONTRACT AGREEMENT.

4.2 The date of commencement is the date from which the contract time set forth in paragraph 4.4 is measured, and shall be the date set forth in the notice to proceed issued by CONTRACTOR to SUBCONTRACTOR.

4.3 The work shall be commenced and phased as directed by CONTRACTOR, and shall be performed in accordance with CONTRACTOR'S construction schedule so as not to impede the progress of the work. SUBCONTRACTOR understands that any delay on its part, or on the part of its subcontractors or suppliers, in the performance of SUBCONTRACTOR'S work, will delay the work of other subcontractors and the CONTRACTOR. SUBCONTRACTOR agrees to begin, perform, and complete its work in an orderly manner and without interruption so as to insure the timely completion of the work.

**4.4** The work of this SUBCONTRACT shall be substantially completed no later than <u>August 31, 2004</u>, subject to adjustments in the subcontract time, as set forth in this SUBCONTRACT AGREEMENT.

**4.5** No extension of time will be valid without CONTRACTOR'S prior written consent. Any request for additional time shall be presented in writing to CONTRACTOR by SUBCONTRACTOR no later then ~~three~~ five (5) working days after first occurrence, or as may be stated elsewhere in the CONTRACT DOCUMENTS, whichever is sooner. In no event shall SUBCONTRACTOR be entitled to any additional time, if CONTRACTOR cannot obtain additional time from the OWNER under the PRIME CONTRACT.

**4.6** In the event SUBCONTRACTOR fails to provide competent and adequate supervision, labor, materials, or equipment to perform this SUBCONTRACT in accordance with the progress of the work and/or the project schedule, CONTRACTOR shall have the right after 72 hour written notice to SUBCONTRACTOR to purchase materials, equipment, and employ labor and/or to perform any portion of SUBCONTRACTOR'S work, all at the sole cost and expense of SUBCONTRACTOR, necessary to maintain the progress schedule.

**4.7** In the event of any delays to the project, SUBCONTRACTOR'S sole remedy shall be to seek an extension of time in accordance with paragraph 4.5 above. CONTRACTOR shall not be liable for any delay damages, or damages in any way attributable to performing work out of sequence, acceleration claims or any other similar type claims, incurred by SUBCONTRACTOR arising out of or in any way associated with the performance of the SUBCONTRACT AGREEMENT.

**4.8** LIQUIDATED DAMAGES - In the event the PRIME CONTRACT contains a liquidated damages provision, and in the event the OWNER lawfully imposes liquidated damages against CONTRACTOR as a result of any action or inaction on the part of SUBCONTRACTOR or any of SUBCONTRACTOR'S subcontractors or suppliers, whether caused in whole or in part by SUBCONTRACTOR or any of SUBCONTRACTOR'S suppliers or SUBCONTRACTORS, then SUBCONTRACTOR shall be liable to CONTRACTOR for the full amount of the damages imposed against CONTRACTOR which monies will be used to compensate the OWNER.

**4.9** The parties recognize that any delay by SUBCONTRACTOR or SUBCONTRACTOR'S suppliers or subcontractors in the performance of this SUBCONTRACT AGREEMENT will result in damages to CONTRACTOR in addition to the liquidated damages that CONTRACTOR may or may not have to pay to the OWNER as identified in paragraph 4.8 above. The parties further agree that the exact amounts of Contractor's damages are too difficult to ascertain at this time. Therefore, the parties agree that in the event SUBCONTRACTOR, or SUBCONTRACTOR'S suppliers or subcontractors delay this job, SUBCONTRACTOR shall pay to CONTRACTOR as liquidated damages, and not as a penalty, the sum of $ **500.00**, per day for each calendar day substantial completion is delayed, and $<u>250.00</u> per calendar day, for each day final completion is delayed.

**ARTICLE V**
**CHANGES IN THE WORK**

**5.1** The OWNER may make changes in the work by issuing modifications to.the PRIME CONTRACT. Upon receipt of a modification issued by the OWNER subsequent to the execution of this SUBCONTRACT AGREEMENT, the CONTRACTOR shall notify SUBCONTRACTOR. Unless otherwise directed by the CONTRACTOR, SUBCONTRACTOR shall not thereafter order materials or perform any work, which would be inconsistent with the modification. SUBCONTRACTOR shall give CONTRACTOR a credit for a decrease in the scope of the work in an amount to be determined in accordance with paragraph 5.4 below.

**5.2** The SUBCONTRACTOR may be ordered in writing by the CONTRACTOR, without invalidating this SUBCONTRACT AGREEMENT, to make changes in the work within the general scope of this SUBCONTRACT AGREEMENT consisting of additions, deletions, modification, or other revisions, including

those required by modification to the PRIME CONTRACT. The SUBCONTRACT SUM and subcontract time shall be adjusted accordingly. The adjustment amount to the SUBCONTRACT SUM shall be determined as set forth in paragraph 5.4 below.

**5.3** The SUBCONTRACTOR may make a written claim for additional compensation or additional time attributable to unforeseen circumstances, changed conditions, or for additional or extra work. Any claim for additional compensation shall be presented in writing to CONTRACTOR by SUBCONTRACTOR no later then ~~three~~ (5) working days after first occurrence, or as may be stated elsewhere in the CONTRACT DOCUMENTS, whichever is sooner. Unless subcontractor's claim is associated with additional work performed due to contractor's damage to subcontractor's work, in which event subcontractor agrees such additional work will be performed at subcontractor's cost.

**5.4** CALCULATION OF CHANGE ORDER AMOUNTS - Any additions or deductions in the SUBCONTRACT SUM shall be calculated as follows:

**a.** In the event that the ARCHITECT or the OWNER direct that extra work be performed or that certain work within the scope of this SUBCONTRACT AGREEMENT be deleted, the change order issued to SUBCONTRACTOR shall either be calculated in accordance with the methods permitted in the PRIME CONTRACT, or on an estimated time and material basis, calculated in advance, prior to the time the work is performed. The election of the method of calculating the change order amount shall be solely within the CONTRACTOR'S discretion. The parties will then enter into a written fixed price change order increasing or decreasing the SUBCONTRACT SUM, prior to the time the work is performed.

**b.** In the event that the change order is chargeable to the CONTRACTOR, and not reimbursable from the OWNER, subcontractor shall calculate in advance, its ~~actual~~ cost for labor and materials, submit its back up to CONTRACTOR, and be permitted to add a total of ~~five~~ (0%) percent for overhead and profit. The parties will then enter into a written fixed price change order to the contract, prior to the time the work is performed.

**c.** In the event that SUBCONTRACTOR is subjected to back charges arising out of the performance of its work, the back charge shall be calculated by either totaling the ~~labor~~, equipment and materials utilized in remedying SUBCONTRACTOR'S work, and adding a total of ~~fifteen~~ (0%) percent for overhead and profit, or at the fixed price amount CONTRACTOR incurs to remedy SUBCONTRACTOR'S work. The election of the method of calculating the cost for the backcharge shall be solely within the CONTRACTOR'S discretion.

**5.5** In the event of a dispute between CONTRACTOR and SUBCONTRACTOR as to whether a particular item of work is an extra to the SUBCONTRACT or included within the scope of the work, or a dispute regarding the value for extra work or a dispute as to the credit amount of deleted work, SUBCONTRACTOR shall perform the work under a written change order containing the objection of the disputing party, which dispute will be resolved at the end of the project in accordance with Article X of this SUBCONTRACT AGREEMENT.

**5.6** Any conflicts in the drawings or contract documents shall be brought to CONTRACTOR'S attention for resolution within ~~three~~ (5) working days of discovery. Any request for additional time or for a change order arising out of any conflict must be timely submitted in accordance with this Article and Article 4 above.

**5.7** No additional or extra work shall be performed by SUBCONTRACTOR unless the scope of the additional work and the price have been agreed to and approved in writing by the Contractor's Project Manager, prior to the time the additional work is performed by SUBCONTRACTOR.

**5.8** Nothing in this Article shall be construed so as to give SUBCONTRACTOR a right to perform any

work contrary to the contract documents, unless directed in writing by the Contractor's Project Manager.

~~5.9 Nothing in this Article shall be construed so as to give SUBCONTRACTOR a right to recover additional compensation for delays, out of sequence work, or acceleration claims.~~

## ARTICLE VI
## PERFORMANCE OF THE WORK

**6.1.1** JOB SAFETY - SUBCONTRACTOR shall abide by all safety programs set up by CONTRACTOR. Moreover, SUBCONTRACTOR shall meet all the requirements of the Occupational Safety and Health Act (OSHA), as amended from time to time, as well as all local ordinances and governmental regulations having jurisdiction over this project. SUBCONTRACTOR shall attend Contractor's weekly Safety Meetings and report any jobsite injuries to CONTRACTOR within twenty-four (24) hours of the occurrence.

**6.1.2** SUBCONTRACTOR shall indemnify and hold CONTRACTOR harmless, to the fullest extent permitted by law, for any fines or sanctions for safety violations levied against CONTRACTOR arising out of, in whole or in part, any action SUBCONTRACTOR, or SUBCONTRACTOR'S agents, employees, suppliers, or SUBCONTRACTORS.

**6.2.1** COORDINATION AND COOPERATION - SUBCONTRACTOR shall cooperate with the CONTRACTOR in scheduling and performing SUBCONTRACTOR'S work to avoid any conflicts, delays in or interference with the work of CONTRACTOR or other subcontractors. Prior to commencing work at the project, SUBCONTRACTOR, or SUBCONTRACTOR'S suppliers, and/or subcontractors shall contact CONTRACTOR to coordinate job site scheduling.

**6.2.2** SUBCONTRACTOR shall coordinate with CONTRACTOR, the status of all salvage materials, components and equipment to be removed from job site. SUBCONTRACTOR shall be solely responsible for any cost associated with hauling, disconnecting and transporting all components under this SUBCONTRACT AGREEMENT.

**6.3** COMMUNICATION - All communication shall be channeled through CONTRACTOR. Change orders, time extensions, or directives shall come only from Contractor's project manager or superintendent.

**6.4** CONSTRUCTION MEETINGS - SUBCONTRACTOR shall have an authorized representative in attendance at all construction meetings. SUBCONTRACTOR shall submit a written progress report to CONTRACTOR at each scheduled job meeting. At each job meeting SUBCONTRACTOR shall be prepared to review with CONTRACTOR and other trades, the general progress of the work and compliance with the job schedule as amended from time to time by CONTRACTOR. CONTRACTOR shall have the right to call special job site meetings upon 24 hour written or oral notice.

**6.5** SCHEDULING - SUBCONTRACTOR shall strictly comply with the job schedule, as may be updated and modified by CONTRACTOR from time to time. SUBCONTRACTOR shall, upon receipt of written order from CONTRACTOR, expedite or accelerate performance of the work, including but not limited to working overtime and/or adding of additional employees or additional shifts, necessary to meet project schedules, as determined in CONTRACTOR'S sole discretion. CONTRACTOR shall not be liable for any acceleration or additional costs incurred by SUBCONTRACTOR, if SUBCONTRACTOR is behind schedule as determined by CONTRACTOR'S sole discretion.

**6.6.1** SUBMITTALS - Not later than ten (10) calendar days after the date of execution of this subcontract agreement, SUBCONTRACTOR shall submit to CONTRACTOR all required shop drawings, cut sheets, manufacturers' data, and other required submittals for approval. All submittals shall be submitted as a complete package for all systems. Submittals shall include in the title block, the project name, project architect, the CONTRACTOR name, the SUBCONTRACTOR'S name submitting the package, and any

SUBCONTRACTOR and/or suppliers name, address and telephone numbers who will be installing or supplying the system.

**6.6.2** Any and all deviations, substitutions, modifications or changes to required submittal shall be flagged, highlighted and made obvious and must be submitted within the time period set forth in paragraph 6.6.1 above.

**6.7.1** The SUBCONTRACTOR shall cooperate with the CONTRACTOR and other SUBCONTRACTOR'S whose work might interfere with SUBCONTRACTOR'S work. SUBCONTRACTOR shall participate in the preparation of coordinated drawings in areas of congestion, if required by CONTRACTOR, specifically noting and advising the CONTRACTOR of potential conflicts between the work of the SUBCONTRACTOR and that of the CONTRACTOR or other SUBCONTRACTORS.

**6.7.2** SUBCONTRACTOR represents and warrants that it has investigated, examined, inspected and is thoroughly familiar with CONTRACT documents, the site and adjoining premises in connection with work to be performed under this SUBCONTRACT AGREEMENT. Further that SUBCONTRACTOR has thoroughly informed itself as to any difficulties in connection therewith and the CONTRACTOR has made no representations of any kind in nature with reference thereto which is not contained within this SUBCONTRACT AGREEMENT.

**6.7.3** SUBCONTRACTOR shall take necessary precautions to protect properly the work of other SUBCONTRACTORS and existing property and equipment from damage caused by operation under this SUBCONTRACT. SUBCONTRACTOR shall be responsible for field dimensions for all items of its work to be fabricated and installed in accordance with work of either the CONTRACTOR or other SUBCONTRACTORS. In the event the work performed by other SUBCONTRACTORS or CONTRACTOR is not appropriate or properly performed in order to accept SUBCONTRACTOR'S work, SUBCONTRACTOR shall, within three days of discovery, notify CONTRACTOR in writing of the problem. Failure to do so shall constitute total acceptance of the work performed by other SUBCONTRACTORS and a waiver of any claim by SUBCONTRACTOR.

**6.8.1** PERMITS AND FEES. The SUBCONTRACT SUM as stated herein includes all costs necessary for SUBCONTRACTOR to pay for and obtain all necessary taxes, permits, licenses, royalties, fees, etc. required to properly perform the work contained within this SUBCONTRACT AGREEMENT. SUBCONTRACTOR shall not perform any work contained herein without first obtaining all necessary permits, licenses, royalties and paying of all necessary fees to any governmental authority having jurisdiction over this project. SUBCONTRACTOR further warrants that it has all necessary and required certificates of competency to perform the work, which is the subject of this AGREEMENT and will provide evidence of same to CONTRACTOR within five calendar days of the date of execution of this AGREEMENT.

**6.8.2** SUBCONTRACTOR shall comply with all federal, state and local rules, laws, ordinances, regulations and orders of any public authorities having jurisdiction over this project. SUBCONTRACTOR shall comply with all federal, state and local tax laws, social security acts, and unemployment compensation acts, workman's compensation acts in so far as applicable to the performance of this SUBCONTRACT. SUBCONTRACTOR represents and warrants that the CONTRACT sum as stated herein includes all federal, state and/or local taxes currently levied for whatever reason as well as any new taxes which become enacted during the course of performance of this work. SUBCONTRACTOR agrees to indemnify and hold the CONTRACTOR harmless to the fullest extent permitted by law, for any and all fines or penalties levied against SUBCONTRACTOR and/or CONTRACTOR based upon SUBCONTRACTOR'S failure to pay any necessary taxes, permit fees or other necessary or related expenses incurred with regard to the prosecution of this work.

**6.9.1** SUPPLYING OF LABOR, MATERIALS AND/OR SUPERVISION. At all times during the performance of this work, SUBCONTRACTOR shall have located at the job site, a full time, competent, English-speaking supervisor who is responsible for SUBCONTRACTOR'S job coordination, quality assurance, compliance with

CONTRACT DOCUMENTS and schedules, and with authority to accept and receive directives on behalf of SUBCONTRACTOR.

**6.9.2** SUBCONTRACTOR shall furnish to the job, workman and supervisors who are skilled in their respective trades and acceptable to CONTRACTOR. SUBCONTRACTOR shall not commit any act or employ any person whose employment is liable to or does create a labor dispute, stoppage of work or disturbances to the job site.

**6.9.3** All materials supplied to the job site shall be new unless otherwise specified and agreed to in writing by CONTRACTOR. All material shall be in strict accordance with the plans of specifications. No deviation from CONTRACT documents is permissible unless approved in writing by the A/E and/or CONTRACTOR prior to delivery to the job and were noted in the submittal documents as required by paragraph 6.6.2 above. All materials and workmanship supplied shall be in accordance with acceptable standards in the construction industry and in strict accordance with the CONTRACT DOCUMENTS. Work, materials and workmanship not in compliance with the CONTRACT DOCUMENTS and not meeting the approval of the OWNER, A/E and/or CONTRACTOR shall, upon rejection, be promptly removed from the job and replaced as required, at no extra cost to OWNER, CONTRACTOR or A/E. Any A/E decisions on matters relating to aesthetics shall be final if consistent with intent expressed in the PRIME CONTRACT.

**6.9.4** SUBCONTRACTOR shall not use or supply any materials or products, which contain asbestos. In the event that any product is found to contain asbestos, CONTRACTOR may, at its sole discretion, secure the steps necessary to remedy any infected area of the work or portion thereof. Said remedial steps may include but shall not be limited to, withholding of any payment to SUBCONTRACTOR. CONTRACTOR may at its option use said funds to engage abatement bond protection, work by others, and any other resources as may be required to fully restore the work and provide contractor with sufficient protection as CONTRACTOR deems necessary in its sole discretion.

**6.9.5** If a hazardous substance of any type of which an employer is required by law to notify its employees is being used on the site by the SUBCONTRACTOR, SUBCONTRACTOR'S, suppliers, SUBCONTRACTORS or anyone directly or indirectly employed by them, SUBCONTRACTOR shall, prior to harmful exposure to any employee on the site, give written notice of the chemical composition thereof (Material Safety Data Sheets) to CONTRACTOR in sufficient detail and time to allow for compliance with such laws by the CONTRACTOR.

**6.9.6** SUBCONTRACTOR warrants that it shall not discriminate against any person based upon race, color, religion, sex, national origin and/or handicap; and that SUBCONTRACTOR is an equal opportunity employer and complies with all state, federal and local laws with regard to preventing discrimination. Where required by the prime contract, SUBCONTRACTOR shall abide by federal, state or local ordinances which regulate jobsite minimum wage rates and submit certified payrolls, with periodic pay requisitions, to the CONTRACTOR.

**6.10.1** PAYMENT OF MATERIALS AND LABOR. SUBCONTRACTOR shall pay for all materials, equipment, supplies and labor used in connection with the performance of this SUBCONTRACT AGREEMENT.

**6.10.2** In the event SUBCONTRACTOR fails to pay any materials, supplier, labor, employees, SUBCONTRACTORS or any persons supplying materials, labor or equipment, or supplies to SUBCONTRACTOR, CONTRACTOR shall have the right to retain out of any payments due or to become due to SUBCONTRACTOR, an amount sufficient to fully indemnify CONTRACTOR and the OWNER against any claim by such party, including but not limited to costs for paying the claim in full, as well as any cost associated therewith including but not limited to attorneys' fees in defending any claims. CONTRACTOR is permitted to retain such amounts, as CONTRACTOR deems necessary in CONTRACTOR'S sole discretion to assure completion of SUBCONTRACTOR'S work and payment in full to all unpaid persons or entities. SUBCONTRACTOR hereby expressly waives any rights, claims, demands, damages or causes of action against CONTRACTOR by reason of any such payments made or monies withheld or deducted as above provided, if CONTRACTOR is compelled to expend monies in discharging or otherwise disposing of any

claims or demands. SUBCONTRACTOR shall pay to CONTRACTOR any such expenditure upon demand. CONTRACTOR reserves the right to issue joint checks to SUBCONTRACTOR and its material suppliers and/or SUBCONTRACTORS in the event CONTRACTOR finds it necessary to insure that payments are being made. However, this right of CONTRACTOR shall not be construed as an obligation on the part of CONTRACTOR to issue joint checks, but is available solely within CONTRACTOR'S sole discretion.

**6.11.1** INDEMNIFICATION. To the fullest extent permitted by law, SUBCONTRACTOR shall indemnify and hold the CONTRACTOR harmless from and against any claims, damages, losses and expenses, including but not limited to court costs, attorneys' fees, and any interest paid on any claims, damages losses or expenses, arising out of or resulting from performance of SUBCONTRACTOR'S work under the SUBCONTRACT AGREEMENT, provided that such claim, damage, loss or expenses are attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property, other than the work itself, including loss of use resulting there from, but only to the extent caused in whole or in part by negligent acts or omissions of the SUBCONTRACTOR, the SUBCONTRACTOR'S SUBCONTRACTORS, suppliers, or anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expenses caused in part by any party indemnified hereunder. SUBCONTRACTOR acknowledges receipt of the first $250.00 paid under this subcontract agreement as specific consideration for this paragraph.

**6.11.2** To the extent SUBCONTRACTOR fails to pay any supplier material or SUBCONTRACTOR, which CONTRACTOR or CONTRACTOR'S bonding company is forced to pay, CONTRACTOR and/or its bonding company shall be entitled to indemnification from SUBCONTRACTOR for the full amounts paid on behalf of SUBCONTRACTOR including but not limited to court costs, attorneys' fees, and any interest paid thereon. CONTRACTOR shall also have the right to withhold payments to SUBCONTRACTOR or to deduct any amounts paid on behalf of SUBCONTRACTOR from amounts owed to SUBCONTRACTOR.

**6.12.1** INSURANCE. SUBCONTRACTOR shall purchase and maintain all insurance coverage and limits of liability as required by contractor to maintain in the prime contract.

**6.12.2** Certificates of Insurance must be submitted within 10 days of execution of this AGREEMENT, <u>or prior to commencing work</u>, whichever is sooner, and must list CONTRACTOR and OWNER as an additional insured. Moreover, certificates must provide on their face, prior to cancellation of any policy for nonpayment, that CONTRACTOR will receive at least 30 days advance notice.

**6.12.3** In the event SUBCONTRACTOR shall fail to maintain any of the above-referenced policies in effect, CONTRACTOR may at its option and sole discretion, pay said premiums on the policies and deduct same from any amounts due and owing to SUBCONTRACTOR under the SUBCONTRACT AGREEMENT. However, this right shall in no way be construed to impose any obligation upon CONTRACTOR to maintain SUBCONTRACTOR'S insurance. Maintaining the insurance shall remain the sole and inclusive obligation of SUBCONTRACTOR under this AGREEMENT.

**6.12.4** If any insurance coverage is required to remain in force after final payment, an additional certificate evidencing continuation of such coverage shall be submitted with the final application for payment as set forth in Article VIII.

**6.12.5** All polices required herein shall remain in full force and effect, without interruption, from the date of commencement of said contracted work, until the date of receipt of final payment by SUBCONTRACTOR unless the policy is required to remain in effect following final completion of this project in which case, said coverage shall remain in force and effect without interruption until the date required hereunder.

**6.13.** BONDING. At any time during the course of performance of this work, CONTRACTOR, may, upon seven (7) days prior written notice, require SUBCONTRACTOR to provide a payment and performance bond for the full amount of the SUBCONTRACT SUM, insuring satisfactory completion of the work and payment to all SUBCONTRACTOR'S, vendors, suppliers, material men, SUBCONTRACTORS, workers and any and all

debts of any kind which may result from the performance of the work. Said bonds are to be obtained by SUBCONTRACTOR within fourteen (14) calendar days of the date of the receipt of notice from CONTRACTOR and must be written by a surety approved by CONTRACTOR.

**6.14.1** WARRANTY - SUBCONTRACTOR herein guarantees and warrants to the OWNER and CONTRACTOR, for a period of one year from the date of final acceptance of SUBCONTRACTOR'S work, or the issuance of a certificate of occupancy, whichever is later, or additional period required by the contract documents, that all materials and equipment furnished under this SUBCONTRACT AGREEMENT and all labor supplied, will be of good quality and new materials unless otherwise required and permitted by the SUBCONTRACT AGREEMENT, and that the work of this SUBCONTRACT will be free from defects and that all work conforms with the requirements in the SUBCONTRACT DOCUMENTS.

**6.14.2** Any warranty documents and any warranties issued by any manufacturers for any equipment supplied by SUBCONTRACTOR under the terms of this AGREEMENT must be supplied to and delivered to CONTRACTOR prior to receipt of final payment for SUBCONTRACTOR'S work and all warranties from any manufacturers and or suppliers will therein be assigned to CONTRACTOR for the benefit of OWNER. Any equipment furnished under this SUBCONTRACT AGREEMENT shall include any initiation devices as required for operation of the equipment.

**6.15.1** CLEANUP. SUBCONTRACTOR shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations performed under this SUBCONTRACT.* In the event SUBCONTRACTOR fails to comply with the requirements in this paragraph, CONTRACTOR may at its sole discretion, retain cleanup personnel for purposes of complying with this paragraph which costs for cleanup personnel may be deducted by CONTRACTOR from any amounts due and owing to SUBCONTRACTOR.

**6.15.2** SUBCONTRACTOR shall protect existing or new equipment and adjacent areas from damage caused by debris or dust created by the performance of this work. The continued operation of existing equipment is essential during the performance of this SUBCONTRACT. Any and all costs necessary for the protection of said surfaces or equipment shall be included in the SUBCONTRACT sum, as defined in Article III.

**6.16** SUBCONTRACTOR shall be responsible for the supply of ice water, cups, dispensers, etc. for all of SUBCONTRACTOR'S employees during the course of this work or any individuals performing work under SUBCONTRACTOR'S agreement including but not limited to SUBCONTRACTOR'S and/or Suppliers.

**6.17** SUBCONTRACTOR shall be responsible for supplying all necessary tools and equipment to perform its work including but not limited to scaffolding and hoisting equipment. SUBCONTRACTOR is responsible for field dimensions and layouts, caulking and sealing, scaffolding, crane, conveying system, maintenance, field offices, storage areas, storage and materials, protection of work and place, cutting and patching, welding, fastening, priming, painting, tagging, core drilling, restoration of surfaces, barricades, barriers, sleeves, pitch pans, curb layout pads, housekeeping pads, backing and blocking. In other words, SUBCONTRACTOR is required to perform all tasks and supply all material necessary to achieve total performance of the work contemplated under the SUBCONTRACT AGREEMENT, although specific items may not be specifically addressed herein. In the event this AGREEMENT requires SUBCONTRACTOR to perform any underground work, SUBCONTRACTOR shall restore all services to original condition or better after work has been performed including but not limited to new concrete paving, striping and finished surfaces.

**6.18** SUBCONTRACTOR shall maintain and secure all materials stored on site from weather elements, vandalism or any other potential hazard. All materials damaged, lost, stolen or vandalized, prior to final acceptance by the OWNER, shall be repaired or replaced by SUBCONTRACTOR at no additional cost to CONTRACTOR.

**6.19** Within ten (10) calendar days of the date of execution of this AGREEMENT, or prior to beginning work, whichever is sooner, SUBCONTRACTOR shall submit to CONTRACTOR, for Contractor's approval, a

PLEASE NOTE: THIS AGREEMENT CONSISTS OF 22 PAGES AND EXHIBITS IDENTIFIED IN ARTICLE XII.



* Add: placed in dumpsters provided by Contractor.

schedule of values allocated to the various parts of the work of this SUBCONTRACT AGREEMENT, aggregating the SUBCONTRACT SUM, made out in such detail as CONTRACTOR may require or as required by the OWNER, and supported by such evidence as the CONTRACTOR and/or OWNER may direct. In applying for payment, the SUBCONTRACTOR shall submit statements based upon an approved schedule of values.

## ARTICLE VII. PROGRESS PAYMENTS

7.1 Requests for progress payment shall be submitted on such forms as proscribed by CONTRACTOR. CONTRACTOR shall receive request for progress payment, one working day before the 25th day of each month.

7.2 SUBCONTRACTOR shall submit an application for payment on a monthly basis for 90% of the value of SUBCONTRACTOR'S labor and materials incorporated into the project as computed on the basis of the approved schedule of values, prices and quantities of work, as determined by CONTRACTOR, or OWNER and/or A/E. To the extent allowable by the CONTRACT DOCUMENTS, SUBCONTRACTOR may include in its request for payment, 90% of the value of materials delivered and stored on site but not yet incorporated into the work, provided all requirements for securing of said materials imposed by CONTRACTOR have been satisfactorily met. All applications for payment must be certified and completed using the payment forms required by CONTRACTOR and correctly submitted in a timely manner. *

7.3. SUBCONTRACTOR agrees that upon request by CONTRACTOR, SUBCONTRACTOR shall furnish such information and consents of surety as CONTRACTOR may require, to confirm SUBCONTRACTOR'S entitlement to payment.

7.4 CONTRACTOR shall have the right at all times to contact SUBCONTRACTOR'S, material suppliers and/or SUBCONTRACTORS to insure that each is being paid by SUBCONTRACTOR for labor and materials furnished for use in performing SUBCONTRACTOR'S work.

7.5 Along with each requisition for payment, SUBCONTRACTOR shall submit a statement identifying the percent of work complete as identified in the approved schedule of values, certified payrolls, for the preceding month, where required by prime contract, as well as partial releases of lien and/or releases of bond for all material suppliers, Sub-subcontractors and from SUBCONTRACTOR evidencing payment in full for the proceeding month and for work performed and materials delivered through the proceeding month.

7.6 Before issuance of any payments to SUBCONTRACTOR, CONTRACTOR may require satisfactory evidence that all payrolls, material bills and all known indebtedness for work for which SUBCONTRACTOR has already received partial payments have been satisfied.

7.7.1 Payment to SUBCONTRACTOR for progress payments shall be strictly contingent upon receipt of payment by CONTRACTOR from the OWNER for the work performed and/or the materials supplied by SUBCONTRACTOR and incorporated into the site by SUBCONTRACTOR for the proceeding month or months. Quantities, amounts and percentages complete, claimed by SUBCONTRACTOR shall be subject to the review of the OWNER, the architect and CONTRACTOR. Should discrepancies occur, the architect's judgment and decision shall be final.

7.7.2 Payment shall be made to SUBCONTRACTOR to the degree in which the OWNER makes payments to CONTRACTOR. CONTRACTOR shall make payment to SUBCONTRACTOR within five working days of receipt of payment from the OWNER, for 90% of the work performed and materials incorporated by SUBCONTRACTOR on the project for the proceeding month. No payment shall be due to SUBCONTRACTOR unless CONTRACTOR has received payment for SUBCONTRACTOR'S work from the OWNER. Notwithstanding any thing to the contrary contained in the CONTRACT documents, payment to



* Retainage shall be reduced to subcontractor as it is reduced to contractor.

work. In the event of any conflict or ambiguity between any of the terms and provisions of this SUBCONTRACT AGREEMENT and any terms and conditions of the PRIME CONTRACT, the terms and conditions of this SUBCONTRACT AGREEMENT shall govern.

7.8 No payment shall be made or due to SUBCONTRACTOR unless CONTRACTOR has received any and all required proof of insurance, submittals, and any other documents necessary and required by the CONTRACT DOCUMENTS.

7.9 In the event SUBCONTRACTOR fails to make payment to any of its suppliers, SUBCONTRACTORS laborers, etc., fails to compensate CONTRACTOR or any other SUBCONTRACTOR or third party for any damage caused by SUBCONTRACTOR, or fails to perform its protection and cleanup obligations pursuant to paragraphs 6.15.1, 6.15.2, or any other obligation imposed upon SUBCONTRACTOR by this agreement, CONTRACTOR in its sole discretion may make direct payments to such individuals or entities and reduce the SUBCONTRACT payment accordingly.

7.10.1 Progress payment shall not constitute acceptance of any; proper, improper, faulty or defective work or materials and shall not release SUBCONTRACTOR of any of its obligations under this AGREEMENT and shall not constitute a wavier of any rights or provisions hereof by CONTRACTOR. Beneficial use or occupancy of the project shall not constitute acceptance of the work.

7.10.2 Payment for material/equipment, furnished by SUBCONTRACTOR shall be made within five working days of receipt of payment by CONTRACTOR, from the OWNER, for 90% of the invoice amount. Material/equipment must be delivered to this jobsite. Clear, legible copies of invoices, showing suppliers' name and address, jobsite address, delivery date, quantity, material's/equipment's description, price and total amount, must be submitted with SUBCONTRACTOR'S requisition for payment.

7.10.3 Payment for material/equipment, furnished by SUBCONTRACTOR shall NOT constitute acceptance or the transfer of ownership or responsibility, for material/equipment, forms SUBCONTRACTOR to CONTRACTOR or OWNER. SUBCONTRACTOR shall remain responsible for protecting, insuring and securing all material/equipment, supplied under this SUBCONTRACT, from vandalism, theft, weather, floods, natural disasters, until installation is complete and the work is accepted, in writing, by CONTRACTOR.

7.11 If an application for payment is received by CONTRACTOR from SUBCONTRACTOR after the required date as set forth above, SUBCONTRACTOR'S work shall be covered and included by the CONTRACTOR in the next application for payment submitted to the OWNER and/or A/E, the following pay period.

## ARTICLE VIII.
## FINAL PAYMENT

8.1 Final payment shall be made within 30 days after all work has been completed and performed by SUBCONTRACTOR and to the satisfaction of the OWNER, CONTRACTOR, and A/E if applicable, and after receipt of Final Payment from the owner for Subcontractor's work. In order to obtain final payment, SUBCONTRACTOR shall submit to Contractor, as a condition precedent to payment the following.

a. Final SUBCONTRACTOR Affidavit identifying all material suppliers, and laborers and all and SUBCONTRACTORS and stating that they had been in full, if that is the case. If not, identifying all unpaid suppliers and SUBCONTRACTOR'S and laborers, and the amounts they are unpaid.

b. Final waiver and release of lien from SUBCONTRACTOR and all SUBCONTRACTOR'S

documents.

d. All required as-built record drawings, operation manuals, etc. required by the CONTRACT documents.

e. Any additional Certificates of Insurance as may be required by this AGREEMENT.

**8.2** It is specifically agreed that in addition to the requirement set forth above, final payment to the SUBCONTRACTOR shall not become due unless and until, and as a strict condition precedent, CONTRACTOR has actually received final payment from the OWNER for SUBCONTRACTOR'S work. It is further agreed that the final payment to the SUBCONTRACTOR shall be limited to the funds received by CONTRACTOR from the OWNER for SUBCONTRACTOR'S work. It is the parties' intent that, to the extent the OWNER does not make payment to CONTRACTOR for SUBCONTRACTOR'S work, then to that same extent, CONTRACTOR and its surety shall not be obligated to and shall have no duty to make final payment to the SUBCONTRACTOR.

**8.3** Issuing of final payment shall not constitute a waiver of any claims for deficiencies for defective work or materials supplied by SUBCONTRACTOR nor of any other claims in which CONTRACTOR may have against SUBCONTRACTOR. Beneficial use or occupancy shall not constitute a waiver of any defects or an acceptance of the work.

**8.4** SUBCONTRACTOR further expressly acknowledges and agrees that CONTRACTOR'S payment bond surety is a specifically intended third party beneficiary of the conditional payment clauses contained in this SUBCONTRACT AGREEMENT under both, this Final Payment Article as well as Article VII dealing with Progress Payments. In the event that a claim is asserted by SUBCONTRACTOR against the payment bond surety by way of arbitration, mediation and/or any state or federal court action, or through any form of alternative dispute resolution, SUBCONTRACTOR agrees that the surety may affirmatively assert the contingent payment clauses as stated in Articles VII and VIII of this SUBCONTRACT AGREEMENT and that this clause shall be a complete defense to nonpayment by principal and surety pending the occurrence of payment from OWNER to CONTRACTOR for SUBCONTRACTOR'S work.

## ARTICLE IX
## REMEDIES FOR DEFAULT

**9.1** In the event CONTRACTOR improperly fails or refuses to make payments to SUBCONTRACTOR, and SUBCONTRACTOR remains unpaid for a period of no less than 60 days, exclusive of retainage, SUBCONTRACTOR may terminate the SUBCONTRACTOR agreement upon supplying CONTRACTOR with 72 hour written notice and an intent to terminate if payment is not received. In the event CONTRACTOR fails to timely cure the nonpayment after receipt of the written 72-hour notice, SUBCONTRACTOR shall have the right to terminate this AGREEMENT.

**9.2.1** Should SUBCONTRACTOR breach or fail to perform any of its obligations and/or requirements and undertakings as required in this SUBCONTRACT AGREEMENT, or in any way breach or fail to perform any obligation required of SUBCONTRACTOR pursuant to the CONTRACT DOCUMENTS, thereby in the opinion of CONTRACTOR, causing or threatening to cause delay in the general progress of the work, or should SUBCONTRACTOR at any time; a) failed to maintain the required insurance overages as required by

paragraph 6.12.1; b) fail to provide any necessary payment and/or performance bonds required by paragraph 6.13; c) fail to supply sufficient skilled workers, equipment and/or materials of proper quality and quantity; d) fail to make timely payments for labor or materials to its suppliers and SUBCONTRACTOR'S or laborers; e) fail to proceed with the work in the sequence directed by CONTRACTOR; f) fail to prosecute the work with promptness and diligence; g) cause stoppage, delay, or interference with the work of CONTRACTOR or any other SUBCONTRACTORS; h) fail to perform the work in compliance with CONTRACT documents; i) breach any other provision contained within the CONTRACT documents; or j) should there be filed by or against SUBCONTRACTOR a petition in bankruptcy or an arrangement or reorganization, with CONTRACTOR being unwilling to accept and hereby declines performance by any trustee in bankruptcy; or k) SUBCONTRACTOR becomes insolvent and goes into liquidation or dissolution and makes a general assignment for the benefit of creditors or otherwise acknowledges insolvency. In the event of any of the above, or any other items which CONTRACTOR deems in its sole discretion to be a material breach of this AGREEMENT, then CONTRACTOR shall give SUBCONTRACTOR 72 hour written notice to cure said deficiency. In the event SUBCONTRACTOR fails to cure said deficiency within the 72 hour period, or fails to begin to make sufficient progress for curing said deficiency, then CONTRACTOR shall have the right and without prejudice to and in addition to any other rights and remedies provided by the CONTRACT documents or by Florida law, to any and all of the following remedies or courses of action:

**9.2.2** Withhold any further payments until the deficiency is corrected, and/or

**9.2.3** Expedite the work in any manner whatsoever, or

**9.2.4** Declare this AGREEMENT to be breached by SUBCONTRACTOR and Contract for the completion of the work with such persons, firms, or corporations as shall be necessary and in the opinion and sole discretion of CONTRACTOR. All costs whatsoever associated with completion of the work or failure by SUBCONTRACTOR shall be charged against SUBCONTRACTOR and SUBCONTRACTOR'S surety, if any, including 10% overhead and 10% profit and both SUBCONTRACTOR and surety, if any, agree to pay CONTRACTOR those sums as wells as any other associated damages, expenses, interests, court cost, reasonable attorney's fees, reasonable appellate fees, and paralegal fees and all of their costs incurred by contractor associated with completing Subcontractor's work.

**9.2.5** In the event CONTRACTOR elects to terminate SUBCONTRACTOR, CONTRACTOR shall have the right to retain all equipment and materials of SUBCONTRACTOR at the job site, which is necessary to continue the reasonable progress of SUBCONTRACTOR'S work.

**9.3** In case of a material breach by SUBCONTRACTOR and termination of this AGREEMENT, said SUBCONTRACTOR shall not be entitled to receive any further payment under this AGREEMENT until the work shall be wholly completed to the satisfaction of CONTRACTOR. At that time, if the unpaid balance of the amount to be paid under the AGREEMENT exceeds the cost incurred by CONTRACTOR in completing the work, CONTRACTOR shall pay such excess to SUBCONTRACTOR, provided all conditions set forth in Article VIII have been complied with. However, if the cost of completing the work exceeds the unpaid balance, then the difference shall become immediately due and payable to CONTRACTOR. Costs shall be defined to include the costs of completing the work in accordance with the CONTRACT DOCUMENTS, and performing and supplying all labor, services, materials, equipment and other items required therefore, as well as all losses sustained by CONTRACTOR including but not limited to delay damages, costs and expenses as well as court costs, reasonable attorney's fees, appellate attorney's fees, paralegal fees and any other costs necessarily incurred by CONTRACTOR in completing SUBCONTRACTOR'S work following SUBCONTRACTOR'S default.

**9.4** SUBCONTRACTOR further agrees that a breach of any other agreement between CONTRACTOR and SUBCONTRACTOR pertaining to this or to any other construction CONTRACT shall be and constitutes a material breach under this agreement thereby entitling CONTRACTOR to assert all its rights and remedies hereunder, including but not limited to a specific right of set-off by CONTRACTOR against amounts otherwise payable to SUBCONTRACTOR under this or any other agreements between CONTRACTOR and

SUBCONTRACTOR.

**9.5.1** CONTRACTOR may terminate this AGREEMENT in whole or in part at any time by sending written notice to SUBCONTRACTOR, whether or not SUBCONTRACTOR is in default, in the event and to the extent the OWNER has exercised its rights of terminating its CONTRACT or any portion thereof, with CONTRACTOR. Such termination shall be effective at the time and in the manner specified in said notice and shall be without prejudice to any claims, which CONTRACTOR or OWNER may have against SUBCONTRACTOR. Upon receipt of any such notice, SUBCONTRACTOR shall, unless the notice directs otherwise, a) immediately discontinue the work on the date and to the extent specified in the notice; b) place no further orders for materials, equipment or services except as may be necessary for completion of such portions of the work as is not discontinued; c) promptly make reasonable efforts to procure cancellations, upon terms satisfactory to CONTRACTOR, of all orders from SUBCONTRACTOR'S suppliers or SUBCONTRACTORS to the extent they relate to the performance of the work discontinued; and d) thereafter execute only that portion of the work as may be necessary to preserve and protect work already in progress and to protect materials and equipment at the project site or in transit thereto.

**9.5.2** SUBCONTRACTOR waives any claims for damages including loss or anticipated profits for incomplete work, on account of termination by CONTRACTOR pursuant to paragraph 9.5.1 and shall accept as its full remedy payment of the amount recovered by CONTRACTOR from OWNER allocated as compensation for SUBCONTRACTOR'S work, less Contractor's markup.

**ARTICLE X**
**DISPUTE RESOLUTION**

**10.1** In the event of any dispute arising out of or any way relating to this SUBCONTRACT AGREEMENT, the performance of the work herein, or the project which is the subject matter of this AGREEMENT, where the amount in dispute or in controversy is for less than $50,000, then said dispute shall be submitted to arbitration and settled in accordance with the construction industry rules as promulgated by the American Arbitration Association. SUBCONTRACTOR further agrees that any claim against CONTRACTOR'S surety, where the amount is less than $50,000.00 will also be resolved in arbitration.

**10.2** If the amount in controversy or in dispute is $50,000.00 or above, then such action shall be resolved in a court of competent jurisdiction, unless the parties mutually agree at that time to submit the claim to arbitration.

**10.3** In the event of any suit and/or arbitration by CONTRACTOR or surety against SUBCONTRACTOR or its surety, or a suit and/or demand for arbitration by a SUBCONTRACTOR or its sureties against the CONTRACTOR or its sureties, then venue for such proceeding shall be exclusively located in Dade County, Florida only. SUBCONTRACTOR and surety do hereby further agree that the provisions concerning venue as contained herein are specifically binding upon them notwithstanding the existence of any contrary venue provisions as may be contained in any surety bond delivered to the OWNER by CONTRACTOR and who or its surety.

**10.4** In the event of any dispute arising out of or any way relating to this SUBCONTRACT AGREEMENT, the CONTRACT DOCUMENTS, or the project which is the subject matter of this agreement, then the prevailing party shall be entitled to recover from the non-prevailing party, the prevailing parties reasonable court costs and attorneys' fees, whether incurred in trial or on appeal, and whether incurred in arbitration or in any action to enforce or confirm an arbitration award or on appeal following arbitration, as well as any reasonable and necessary paralegal fees associated therewith.

**ARTICLE XI**
**MISCELLANEOUS**

**11.1** This AGREEMENT is entered into in the State of Florida and shall be governed by and construed in

accordance with the laws of the State of Florida.

**11.2** In any event any paragraph, clause, provision or article of this provision should be found to be void or invalid or in conflict with any provision of Florida law, then it is the parties specific intent that all remaining paragraphs, clauses and articles of this CONTRACT become sever able and all remaining clauses not invalidated shall remain in full force and effect.

**11.3** Any names or titles given to paragraphs or articles designated herein are merely for purposes of organization and convenience and shall not constitute substantive points of this contract.

**11.4** All notices required pursuant to the terms of this SUBCONTRACT AGREEMENT or in the CONTRACT DOCUMENTS shall be required to be in writing and sent to the address as identified on page one of this SUBCONTRACT AGREEMENT via certified mail, return receipt requested. Alternatively, all written notices shall be deemed proper and valid if sent via electronic facsimile transmission, to the fax numbers identified on page one of this AGREEMENT providing written confirmation or proof of facsimile transmission is available.

**11.5** Nothing contained herein shall be construed or considered as rendering subcontractor as an agent or employee of CONTRACTOR and SUBCONTRACTOR shall at all times be considered a separate independent contractor.

**11.6** SUBCONTRACTOR agrees to provide any post completion assistance required by OWNER including OWNER training, investigation or a warranty concerns or any other assistance necessary as outlined in the CONTRACT documents.

**11.7** This SUBCONTRACT AGREEMENT in the undertakings of CONTRACTOR and SUBCONTRACTOR are made for the parties sole benefit and for the benefit of CONTRACTOR'S surety. No party other than CONTRACTOR'S surety shall be construed as intended third party beneficiaries of this AGREEMENT. No other parties may seek or assert any claim against CONTRACTOR by through or under by reason of any third party relationship with SUBCONTRACTOR pursuant to the terms of this AGREEMENT.

**11.8** This AGREEMENT represents the entire AGREEMENT between the parties. There are no oral representations or other agreements, which have been made between the parties except as, stated in this AGREEMENT. SUBCONTRACTOR represents and warrants that no other representation or warranties or promises or inducements have been made to SUBCONTRACTOR other than the terms and conditions set forth in this written AGREEMENT. This written AGREEMENT may not be changed, modified or altered in any way except in writing signed by duly authorized officers or agents and the parties hereto.

## ARTICLE XII
## ADDITIONAL DOCUMENTS

**12.1** In addition to the CONTRACT documents identified herein, the following exhibits to this SUBCONTRACT AGREEMENT shall be considered included and part of this SUBCONTRACT AGREEMENT:

1. Attachment "A" - Scope of Work
2. Attachment "B" - List of Documents
3. Attachment "C" – Unit Prices

## Attachment "A" – Scope of Work

1. Any fees required for Utilities and/or Governmental Agencies, including any charges related to the cost of permanent or temporary service installation are not included.

2. Applicable sales tax and standard clean up to a central point on site are included. The removal, transport and disposal of any excess fill and/or any hazardous material will be by others and is not included in Fisk Electric Co. price.

3. All excavation, shoring, sheet piling and de-watering for manholes and duct banks, of any nature are included in Fisk Electric Co. price.

4. All necessary patching and/or restoration of existing surfaces and sub-grade bases, of any nature, shall be by others and is not included in Fisk Electric Co. price.

5. Solo Construction (light towers) will be available if and only if Solo is working at night. Fisk will have to supply lighting (light towers) under any other circumstances.

6. All manholes will be supplied and installed by Fisk. Grounding and cable racks for manholes will be supplied and installed by Fisk Electric Co.

7. All concrete sign bases will be by others and are not included in Fisk Electric Co. price.

8. The removal of all existing fixture base cans and airport lighting duct bank/manholes to be demolished will be by others.

9. The adjustment, relocation or removal of existing utilities, if required, for the installation of

new utilities is not included in Fisk Electric Co. price.

10. All electrical work will be accomplished during normal daytime hours except for areas mandated as night work only and detailed on the MOT drawings SP-2 to SP-18.

11. All closed taxiway/runway markers and temporary airfield guidance signs as detailed on Drawing SP-18, will be furnished, installed, relocated and maintained by others and are not included in our price.

12. Fisk Electric Co., will disconnect and make safe only, those buildings to be demolished. Building 1045 electrical vault equipment will be disconnected and made safe for removal, storage or transport by others.

13. Power for all MOT temporary lighting will be derived form existing taxiway lighting circuits.

14. Generator to be furnished, installed and connected by Fisk Electric Co., Muffler, Geo Thermal Heater and Day Tank are to be furnished by Fisk Electric Co., and installed. Fuel tanks, fuel lines heater lines, exhaust lines, insulation are not included in Fisk Electric Co. price.

15. Payment and performance bonds are included in Fisk Electric Co price.

**16. It is agreed upon that Fisk Electric will make every effort possible to involve FLP Enterprises Contractors, Inc. into their scope of work. If FLP does subcontract any portion of the work from Fisk Electric, Solo Construction will be held harmless of any repercussions that may occur if FLP Enterprises fails to perform in accordance with the contract plans and specifications.**

## Attachment "B" - List of Documents

A. Miami International Airport Midfield Expansion Phase IIIC to be constructed in accordance with Plans and Specs:

1. Designed by: PAWA COMPLEX INT'L INC
   12938 SW 133rd Court
   Miami, Florida 33186

2. Sheets: G-1thru G-5, SP-1 thru SP-18, UC-1 thru UC-2, C-1 thru C-39, W-1 thru W-5 San-1 thru San – 5, L-1A thru L-7, LD-1 thru LD-3, S-1thru S-4, DB-1 thru DB-8, COM-1 thru COM-7, dated 09/14/01.

B. Project Manual: Volume 1 of 3, Volume 2 of 3 and Volume 3 of 3, the Miami-Dade County Aviation Department. Dated September 2001, prepared by PAWA COMPLEX INT'L INC.

**C. Solo Construction will need the Payment and Performance Bonds.**

**WITNESSETH WHEREOF**, the parties hereto have executed this SUBCONTRACT AGREEMENT under seal, the day and year first above written.

SUBCONTRACTOR:

**Fisk Electric**
**a Florida Corporation**

By : V.P.
Print: Pat Clyne
Title: Vice President

CONTRACTOR:

**SOLO CONSTRUCTION CORP.**
**a Florida Corporation**

By :____________________
Randy Pierson
Chief Executive Officer

WITNESSES :

By : James D Kinser
JAMES D. KINSER

By :
CRISTINA PAMPLIN

WITNESSES :

By :____________________

By :____________________

"ATTACHMENT"-C

# FISK ELECTRIC/FLP ENTERPRISES

*UNIT PRICE SCHEDULE*

*PROJECT:* **MIDFIELD EXPANSION 111C**

| BID ITEM<br>INCLUDES EXCAVATION & MANHOLES | QUANITY | UNIT PRICE | EXTENDED |
|---|---|---|---|
| *#2- DISC. INCINERATOR | 1.00 | 611.52 | 611.52 |
| *#3- DISC.WASH RACK,WEIGHT STATION | 1.00 | 611.52 | 611.52 |
| *#4-DISC.ELECT. VAULT | 1.00 | 6115.20 | 6115.20 |
| *#5-DISC.CFR BLDG. | 1.00 | 1834.56 | 1834.56 |
| *#6-DISC. LUGGAGE BLDG. | 1.00 | 611.52 | 611.52 |
| *#7-DISC.NOAA WEATHER STATION | 1.00 | 611.52 | 611.52 |
| *#8-DISC.TRITURATOR FACILITY | 1.00 | 611.52 | 611.52 |
| *#70-COMM. MANHOLE | 8.00 | 26657.21 | 213257.64 |
| *#72-AIRFIELD LIGHTING MANHOLE | 7.00 | 11211.29 | 78479.04 |
| *#73-REPLACE AIRFIELD MANHOLE | 3.00 | 16413.84 | 49241.51 |
| *#74-TIE TO EXISTING FPL MANHOLE | 3.00 | 1333.87 | 4001.60 |
| *#75-ELECT. MANHOLE | 5.00 | 16766.80 | 83833.98 |
| *#76-TIE TO EXISTING COMM. MANHOLE | 4.00 | 1979.85 | 7919.42 |
| *#77-TIE TO AIRFIELD LIGHTING MANHOLE | 6.00 | 690.09 | 4140.54 |
| *#80-#8AWG 5KV CABLE | 129000.00 | 0.65 | 84324.37 |
| *#81-#6 COUNTERPOISE | 57000.00 | 0.76 | 43054.11 |
| *#81A-CONDUIT,WIRE,CABLE | 1.00 | 17882.60 | 17882.60 |
| *#81B-PANELBOARD | 1.00 | 520.66 | 520.66 |
| *#81C-500KW GENERATOR | 1.00 | 83102.09 | 83102.09 |
| *#81D-DRY TYPE TRANSFORMER | 1.00 | 882.58 | 882.58 |
| *#81E-INSTALL CCR DEVICES | 9.00 | 880.02 | 7920.16 |
| *#81F-WIRING DEVICES & PLATES | 6.00 | 21.72 | 130.32 |
| *#82-2W2 PVC DUCT | 2200.00 | 10.54 | 23178.56 |
| *#83-3W2 PVC DUCT | 700.00 | 15.92 | 11141.30 |
| *#84-4W2 PVC DUCT | 200.00 | 17.85 | 3570.50 |
| *#85-1W2 PVC DUCT | 46000.00 | 7.65 | 351735.26 |
| *#86-24W4 PVC DUCT | 860.00 | 137.80 | 118504.13 |
| *#87-4W4 PVC DUCT | 460.00 | 35.65 | 16400.69 |

"ATTACHMENT"-C

| | | | |
|---|---|---|---|
| *#88-12W4 PVC DUCT | 380.00 | 86.82 | 32992.12 |
| *#89-9W6 PVC DUCT | 1710.00 | 88.10 | 150653.72 |
| *#90-16W4 PVC DUCT | 1760.00 | 100.49 | 176863.64 |
| *#91-L-852B BI-DIR.TW C/L | 319.00 | 969.60 | 309303.84 |
| *#92-L-852B ELEV.TW EDGE | 208.00 | 846.27 | 176023.68 |
| *#93-REMOVE C/L FIXTURE | 10.00 | 47.39 | 473.93 |
| *#93A-REMOVE TW EDGE LIGHT | 117.00 | 66.64 | 7796.88 |
| *#94-L-858B 2-MOD SIGN | 52.00 | 1129.70 | 58744.15 |
| *#95-REPLACE SIGN PANEL | 15.00 | 740.88 | 11113.20 |
| *#95A-REMOVE AIRFIELD SIGN | 2.00 | 611.52 | 1223.04 |
| *#95B-JUNCTION BOX | 2.00 | 2864.43 | 5728.87 |
| *#95C-MDAD SUPPLIED REGULATOR | 9.00 | 540.91 | 4868.20 |
| *#96-L850C BI-DIR. | 2.00 | 1093.21 | 2186.42 |
| *#97-L850C BI-DIR. | 2.00 | 1093.21 | 2186.42 |
| *#98-L852B TW C/L | 93.00 | 981.81 | 91308.01 |
| *#99-L-852B TW C/L | 7.00 | 1747.67 | 12233.72 |
| *#100-L-852B TW C/L | 4.00 | 985.82 | 3943.26 |
| *#101-L-852B TW C/L | 41.00 | 990.65 | 40616.63 |
| *#102-BI-DIR. C/L | 22.00 | 977.61 | 21507.32 |
| *#102B-REMOVE EXISTING LITE | 20.00 | 76.44 | 1528.80 |
| *#103-L852-BI-DIR. C/L | 20.00 | 974.04 | 19480.89 |
| *#104-L852-UNI-DIR. C/L | 21.00 | 1640.29 | 34446.18 |
| *#105-L852-BI-DIR C/L | 4.00 | 936.74 | 3746.97 |
| *#106-L852-UNI-DIR C/L | 19.00 | 736.19 | 13987.70 |
| *#107-L852-UNI-DIR. C/L | 13.00 | 860.86 | 11191.20 |
| *#108-L861T TEMP. E/E | 3.00 | 761.36 | 2284.08 |
| *#113-MOBILIZATION | 1.00 | 130,030.00 | 130,030.00 |
| *#114-MAINT. OF TRAFFIC | 1.00 | 258,112.50 | 258,112.50 |

TOTAL AMOUNT OF BID 2,798,803.76

# Exhibit 3

**URGENT COMMUNICATION**

**FISK**

**June 7, 2006**

**Page 1 of 1**

**Transmitted Via Certified Mail**
**United States Postal Service**
**# 7004-0750-0001-9342-0176 &**
**# 7004-0750-0001-9342-0183**

**Liberty Mutual**
**175 Berkeley Street**
**Boston, MA 02117**

**Cc: Matson Charleston Surety**
**770 S. Dixie Hwy, Suite 101**
**Coral Gables, FL 33146**

**Subject:** **Notice to Surety of Non-Payment**
**Bond#:** **964-000-731 & 964-000-731 (A)**

**Project:** **Midfield Expansion PH III, Space C @ MIA, MDAD Project #95087M11**
**Contractor:** **Solo Construction Corp., 3855 Commerce Parkway, Miramar, FL 33025**

Reference: Attached Sworn Statement of Accounts, AIA G702, SOV, Approved WO Log, Pending WO Log, Pending. BC's

Dear Sir or Madam:

Pursuant to rights and remedies afforded our concern, Fisk Electric hereby submits this and the attached as a recorded Notification of Surety for Non-Payment of Amounts due.

The attached Sworn Statement of Account and Validity of Claim Properties represents the current accounting overview of the subject project as it is recognized at this time. The amount of **Line Item #4, $390,067. 30,** reflects amounts due and payable since 10/30/06. According to our investigation this amount has been approved, by the Owner, to Solo Construction on or before the 10/30/06 date and is the primary catalyst regarding this notice of non-payment. This amount does not include a calculated **Retained Amount of $139,960. 01.**

**Line Item #7, $209,604. 88,** and indicated within the attached statement is indicative of amounts considered due and payable since 12/31/05. These items of account were a result of field ordered activities with promise of payment. Unfortunately, Solo Construction has yet to act upon these items of payment with regard to execution of CO, final negotiation with Owner, or any other form of closeout processes normally and reasonably expected.

Additionally, **Items #8 & #9, Total of $911,790. 80,** indicate amounts submitted for claim against the Prime / Owner due to unforeseen circumstances and/or conditions beyond the control of Fisk Electric. We have yet to receive any form of meaningful comment or offer of reconciliation regarding these issues.

**Please address all responses and or inquiry to:**

**Fisk Electric**
**10125 NW 116th Way**
**Suite # 14**
**Medley, Florida 33178**
**Attn: Pat Clyne, Vice President (or) Fred Woodward, Construction Manager**

Your timely response will be greatly appreciated.

Respectfully,
Fisk Electric Company

Fred Woodward
Construction Manager

Cc: Pat Clyne, Paul Maggi, Claim File, Readers File

**URGENT COMMUNICATION**

**FISK**

**August 2, 2006**



**Liberty Mutual (Surety)**
**175 Berkeley Street**
**Boston, MA 02117**

**Transmitted Via Certified Mail**
**United States Postal Service**
**# 7004-0750-0001-9342-0213 &**
**# 7004-0750-0001-9342-0220**

**Cc: Matson Charleston Surety**
**770 S. Dixie Hwy, Suite 101**
**Coral Gables, FL 33146**

**Subject:** **Notice to Surety of Non-Payment – 2nd Notice**
**Bond#:** **964-000-731 & 964-000-731 (A)**

**Project:** **Midfield Expansion PH III, Space C @ MIA, MDAD Project #95087M11**
**Contractor:** **Solo Construction Corp., 3855 Commerce Parkway, Miramar, FL 33025**

Reference: Sworn Statement of Accounts, AIA G702, SOV, Approved WO Log, Pending WO Log, Pending. BC's (Attached)

Dear Sir or Madam:

Please consider this as the 2nd **Notice of Non-Payment** concerning the above described project and contractor.

To date we, Fisk Electric, have yet to receive a response, confirmation of review, or any other form of communication from Surety concerning the subject notice. Additionally, we have information that Solo Construction has been recently issued Consent of Surety Affidavit although the notice of non-payment has been transmitted by Fisk Electric, via certified mail, and verified as received.

Please be advised that, pursuant to the Surety's lack of return response, in collaboration with the recent issuance of Consent of Surety to Solo Construction, Fisk Electric must, and will, hold Liberty Mutual and its affiliated entities as the primary respondent with regards to the unpaid amounts and therefore wholly liable for all associated costs, issues, and concerns. Be advised that the subject issues are being finalized and reviewed by legal counsel representing Fisk Electric. Consequently, absent of immediate response and communication by the Surety, litigation will be forthcoming.

Again, attached is our original Notice to Surety including all documentation transmitted with same. If further documentation, investigation, ect. Is warranted. Please advise as soon as possible.

**Please address all responses and or inquiry to:**

**Fisk Electric**
**10125 NW 116th Way**
**Suite # 14**
**Medley, Florida 33178**
**Telephone:** **305-884-5311**
**Fax:** **305-884-2192**
**Attn: Pat Clyne, Vice President, Paul Maggi, Op's Manager, Fred Woodward, Construction Manager**

Your timely response will be greatly appreciated.

Respectfully,
Fisk Electric Company

Fred Woodward
Construction Manager
Cc: Pat Clyne, Paul Maggi, Claim File, Readers File

JS 44 (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

**I. (a) PLAINTIFFS**
Fisk Electric Company

**(b)** County of Residence of First Listed Plaintiff: Texas
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Herman M. Braude, Esq.;Braude & Margulies, P.C.
1200 Potomac St. NW, Washington, DC 20007
(202) 471-5400

**DEFENDANTS**
Solo Construction Corporation and Liberty Mutual Insurance Company

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

Attorneys (If Known)

**(d) Check County Where Action Arose:** ☑ MIAMI-DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

1:2007CV22120/PAS/CMM

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☑ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☑ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☒ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

PERSONAL INJURY
☐ 362 Personal Injury - Med. Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 440 Other Civil Rights

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence
Habeas Corpus:
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**FORFEITURE/PENALTY**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs.
☐ 660 Occupational Safety/Health
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt.Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

FILED by [illegible] D.C.
DKTG
AUG 16 2007
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Re-filed- (see VI below) ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page): a) Re-filed Case ☐ YES ☑ NO b) Related Cases ☐ YES ☑ NO
JUDGE DOCKET NUMBER

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause **(Do not cite jurisdictional statutes unless diversity)**:
28 U.S.C. 1332: claim on Little Miller Act bond and breach of contract

LENGTH OF TRIAL via 4 days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
**DEMAND $** 1,317,475.00
CHECK YES only if demanded in complaint: **JURY DEMAND:** ☑ Yes ☐ No

**ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE**

SIGNATURE OF ATTORNEY OF RECORD: Herman Braude
DATE: 8/14/07

**FOR OFFICE USE ONLY**
AMOUNT $350.00 RECEIPT # 964802 IFP

08/16/07